# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **MELISSA ELIZABETH LUCIO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 4:22-cv-00996** |
| **vs.** | § | |
| | § | |
| **BRYAN COLLIER,** Executive Director, | § | |
| Texas Department of Criminal Justice | § | |
| Huntsville, Texas | § | |
| | § | |
| **BOBBY LUMPKIN,** Director, Texas | § | **(Death Penalty Case)** |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, Huntsville, Texas | § | |
| | § | |
| **DENNIS CROWLEY,** Warden, Texas | § | **Ms. Lucio is scheduled to be executed on** |
| Department of Criminal Justice, Huntsville | § | **April 27, 2022** |
| Unit, Huntsville, Texas | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MOTION FOR STAY OF EXECUTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

      I.     Ms. Lucio's Request for Last Rites, Including Viaticum, in the Execution
Chamber and Her Deep Religious Faith ................................................................. 2

      II.    TDCJ's Shifting Policies....................................................................................... 5

ARGUMENT ....................................................................................................................... 7

      I.     Ms. Lucio Is Likely to Succeed on the Merits of Her Claims ............................... 8

            A.    RLUIPA ................................................................................................... 8

            B.    Free Exercise Clause............................................................................. 11

      II.    TDCJ's Partial Denial of Ms. Lucio's Request for Last Rites, Including Its
Summary Denial of Her Request for Viaticum, Will Cause Irreparable
Harm ................................................................................................................... 12

      III.   The Balance of Equities and the Public Interest Strongly Favor a Stay ............... 13

CONCLUSION................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**<u>CASES</u>**

*Barbee v. Collier,*
No. 4:21-CV-3077, 2021 WL 4666778 (S.D. Tex. Oct. 7, 2021) ................................. passim

*Battaglia v. Stephens,*
824 F.3d 470 (5th Cir. 2016) ............................................................................................ 12

*Cantwell v. Connecticut,*
310 U.S. 296 (1940) .......................................................................................................... 11

*Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .................................................................................................. 11, 12

*Fulton v. Philadelphia,*
141 S. Ct. 1868 (2021) ...................................................................................................... 10

*Gutierrez v. Saenz,*
141 S. Ct. 1260 (2021) ........................................................................................................ 5

*Hilton v. Braunskill,*
481 U.S. 770 (1987) ............................................................................................................ 7

*Holt v. Hobbs,*
574 U.S. 352 (2015) ............................................................................................................ 8

*Kite v. Marshall,*
454 F. Supp. 1347 (S.D. Tex. 1978) ................................................................................ 13

*Landis v. N. Am. Co.,*
299 U.S. 248 (1936) .......................................................................................................... 14

*Leyva v. Certified Grocers of Cal., Ltd.,*
593 F.2d 857 (9th Cir. 1979) ............................................................................................ 14

*Lockyer v. Mirant Corp.,*
398 F.3d 1098 (9th Cir. 2005) .......................................................................................... 14

*Moussazadeh v. Tex. Dep't of Crim. Just.,*
703 F.3d 781 (5th Cir. 2012) ............................................................................................ 15

*Murphy v. Collier,*
139 S. Ct. 1475 (2019) ........................................................................................................ 5

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................................................................ 7, 8

Page

*O'Bryan v. Estelle,*
  691 F.2d 706 (5th Cir. 1982) ........................................................................ 12, 13

*Ramirez v. Collier,*
  ___ S. Ct.___ (Mar. 24, 2022) (No. 21-5592), 2022 WL 867311 ................................. passim

*Ramirez v. Collier,*
  142 S. Ct. 50 (2021) .................................................................................. 6

*Smith v. Comm'r, Ala. Dep't of Corr.,*
  844 F. App'x 286 (11th Cir. 2021) .................................................................. 13

*United States v. Vialva,*
  976 F.3d 458 (5th Cir. 2020) ........................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................................................... 7

## STATUTES

42 U.S.C. § 1983 ........................................................................................ 1

42 U.S.C. § 2000cc-1(a) ................................................................................. 8

## OTHER AUTHORITIES

Br. for United States Conf. of Cath. Bishops & Tex. Cath. Conf. of Bishops as
  *Amicus Curiae* in Supp. of Pet'r, *Ramirez v. Collier*, ___ S. Ct.___ (U.S.
  Mar. 24, 2022) (No. 21-5592), 2021 WL 4670807 ................................................... 3, 10

Br. of Spiritual Advisors & Former Corr. Officials as *Amicus Curiae* in Supp. of
  Pet'r, *Ramirez v. Collier*, ___ S. Ct.___ (U.S. Mar. 24, 2022) (No. 21-5592),
  2021 WL 4670366 .................................................................................... 9

Catechism of the Catholic Church ..................................................................... 3, 4

Int'l Comm'n on English in the Liturgy, Cath. Church, *The rites of the Catholic
  Church: the Roman Ritual revised by decree of the Second Vatican
  Ecumenical Council and published by authority of Pope Paul VI* (1983) ...................... 3, 4, 9

Jolie McCullough, *U.S. Supreme Court tells Texas to let a condemned man's
  pastor touch him and pray aloud during execution*, Tex. Trib. (Mar. 24, 2022),
  https://www.texastribune.org/20022/03/24/supreme-court-john-ramirez/ ........................ 6

Joseph Delany, *Preparation for Death*, 4 Cath. Encyclopedia (New York: Robert Appleton Co. 1908), *available at* http://www.newadvent.org/cathen/04660c.htm ................................................................... 3, 9

Juan Lozano, *Texas to Review Prayer, Touch Requests in Executions by Case*, Associated Press (Mar. 30, 2022), *available at* https://www.nbcdfw.com/news/local/texas-news/texas-to-review-prayer-touch-requests-in-executions-by-case/2927750/ ...................................................................... 7

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................................................................. 11

## INTRODUCTION

Plaintiff Melissa Elizabeth Lucio, a devoted member of the Catholic faith, is scheduled to be executed on April 27, 2022. She makes two requests for her final moments: to have her designated spiritual advisor audibly pray with her, and for the advisor to physically touch her to administer last rites and sacraments, including the Anointing of the Sick and Viaticum (i.e., communion). These ministrations are a vital part of Roman Catholic worship and integral to her religious beliefs. But the Texas Department of Criminal Justice's ("TDCJ") "No Contact" and "No Speaking" policies, banning spiritual advisors from praying aloud or touching inmates in the execution chamber, preclude Ms. Lucio from receiving Viaticum on her deathbed and cast uncertainty around whether Ms. Lucio will be able to receive the kind of spiritual comfort necessary to her Catholic faith. As the Supreme Court just held in *Ramirez v. Collier*, in an 8-1 decision, the enforcement of TDCJ's "No Contact" and "No Speaking" policies to generally forbid audible prayer and religious touch during an execution likely violates the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *Ramirez v. Collier*, ___ S. Ct.___ (Mar. 24, 2022) (No. 21-5592), 2022 WL 867311, at *14. It follows that the application of the policy (1) to deny Ms. Lucio's request for Viaticum, a specific combination of audible prayer and religious touch, and (2) to give the Warden sole discretion over when Ms. Lucio's spiritual advisor may audibly pray equally violates her religious liberty.

With her claims under 42 U.S.C. § 1983, Ms. Lucio seeks (1) declaratory relief that the TDCJ policies—on their face, and as applied to her—violate her rights under RLUIPA and the First Amendment's Free Exercise Clause; and (2) preliminary and permanent injunctive relief prohibiting defendants from executing her without allowing her spiritual advisor to be present in the chamber with her, to pray audibly with her, and to have sacramental physical contact with

her, including Viaticum. She now moves for a stay of execution so this Court may decide the merits of her case.

## STATEMENT OF FACTS

### I. Ms. Lucio's Request for Last Rites, Including Viaticum, in the Execution Chamber and Her Deep Religious Faith

As her complaint and supporting declarations detail, Ms. Lucio is a devout Roman Catholic. *See* Compl. ¶¶ 31–67. She has expressed her desire, as an integral part of her beliefs as a Roman Catholic, to have her designated spiritual advisor, Deacon Ronald Lastovica, present with her in the execution chamber to pray aloud for her and to physically touch her to administer the last rites, including Viaticum. *See id*. ¶¶ 33–38.

During her incarceration on death row, Ms. Lucio "[has] turned to God for support, direction, and guidance," and "found great comfort in finding faith and the spiritual strength the Catholic faith has given [her] to deal with [her] situation." *Id*. ¶ 3. Ms. Lucio's faith pervades her daily life. She attends Mass regularly; meets with her spiritual advisor, Deacon Lastovica, weekly; reads the Bible on her own; and engages with her fellow inmates in Bible study and discussions. *Id*. ¶¶ 42, 44, 57–59, 61. She is a person of deep faith and ministers to others—her children, her fellow inmates, and even her own spiritual advisor. *See, e.g.*, Compl. Ex. 13 Decl. of Ronald Wayne Lastovica, Deacon ¶ 6 ("Melissa has never failed to direct others to Christ in dealing with everyday life matters, especially her family."); Compl. Ex. 15 Decl. of John Vincent Lucio ¶ 4 (Ms. Lucio's son attesting to how Ms. Lucio's turn to faith has "made a huge impression on [him]"); Compl. Ex. 16, Decl. of Bobby Alvarez ¶ 3 (Ms. Lucio's son writing that "[his mother] is always talking about her faith and what she has done over the years to become a better person with the grace of God"). Ms. Lucio has explained, "As a Roman Catholic, one of our most sacred sacraments is Anointing of the Sick, and Viaticum, also called last rites. In

viaticum, the dying person is united with Christ in his/her passage out of this world to the Father."  Compl. Ex. 7, Step 2 Grievance Form submitted by Ms. Lucio on Mar. 2, 2022 ("Step 2 Grievance") (quotations omitted) (full capitalization omitted); *see also* Compl. Ex. 13, Decl. of Ronald Wayne Lastovica, Deacon ¶ 4 (explaining that Ms. Lucio has "received the Sacraments of Baptism, Communion, and Confirmation").

The Roman Catholic faith "teaches over 1 billion Catholics, consistent with historic Christian tradition, that the final moments of life offer a unique final chance to prepare for 'our heavenly homeland' and for pardon and redemption."  Br. for United States Conf. of Cath. Bishops & Tex. Cath. Conf. of Bishops as *Amicus Curiae* in Supp. of Pet'r, *Ramirez v. Collier*, ___ S. Ct.___ (U.S. Mar. 24, 2022) (No. 21-5592), 2021 WL 4670807, at *7 (citations omitted). Receiving last rites, including Viaticum—"food for the passage through death to eternal life"—is critical to this preparation for death.  Int'l Comm'n on English in the Liturgy, Cath. Church, *The rites of the Catholic Church: the Roman Ritual revised by decree of the Second Vatican Ecumenical Council and published by authority of Pope Paul VI*, at 158 (1983); *see also* Joseph Delany, *Preparation for Death*, 4 Cath. Encyclopedia (New York: Robert Appleton Co. 1908), *available at* http://www.newadvent.org/cathen/04660c.htm.  The Eucharist as Viaticum is also known as the last sacrament of the Christian, *see* Catechism of the Catholic Church, heading V; *id*. §§ 1524–25, and marks "the completion and crown of the Christian life on this earth, signifying that the Christian follows the Lord to eternal glory and the banquet of the heavenly kingdom."  Int'l Comm'n on English in the Liturgy, *supra*, at 158.

Viaticum, by definition, requires a specific combination of audible prayer and physical touch.  It begins with "some elements of the Mass, especially a brief liturgy of the word," "ordinarily consisting of a single biblical reading," which "gives the minister an opportunity to

explain the word of God in relation to viaticum." *Id*. at 186, 188. It culminates in the spiritual advisor giving the person wine and bread, accompanied by "the special words proper to viaticum": "May the Lord Jesus Christ protect you and lead you to eternal life." *Id*. at 160; *see also* Catechism §§ 1524–25.

Consistent with the liturgy of the Church and her deeply held beliefs, Ms. Lucio has expeditiously pursued her requests for accommodation, including Viaticum, through the TDCJ grievance process since the setting of her execution date, in late January. *See, e.g.*, Compl. Ex. 5, Step 1 Grievance Form submitted by Ms. Lucio on Jan. 25, 2022 ("Step 1 Grievance"); Compl. Ex. 6, Re-submitted Step 1 Grievance Form submitted by Ms. Lucio on Jan. 31, 2022 ("Re-submitted Step 1 Grievance"); Compl. Ex. 7, Step 2 Grievance Form submitted by Ms. Lucio on Mar. 2, 2022 ("Step 2 Grievance"). TDCJ denied her initial request on February 23, 2022, over three weeks after she submitted it, stating, "At this time, the spiritual advisor is not allowed to touch the inmate or speak out loud once inside the execution chamber. No further action is warranted by this office." Compl. Ex. 6, Re-submitted Step 1 Grievance. Ms. Lucio then promptly appealed this decision by submitting her Step 2 Grievance on March 2, 2022. Compl. Ex. 7, Step 2 Grievance. On March 1, 2022, undersigned counsel e-mailed an inquiry to TDCJ General Counsel Kristen Worman and Ms. Amy Lee to inquire whether the current policies forbade Ms. Lucio's designated spiritual advisor from being able to pray aloud and physically touch her to provide spiritual comfort in the execution chamber and whether the restrictions imposed on Mr. John Ramirez's spiritual advisor were still in effect. Compl. Ex. 8, e-mailed letter from A. Richard Ellis, counsel for Ms. Lucio, to Kristen Worman, general counsel for TDCJ, and Amy Lee, project coordinator for the Office of General Counsel for TDCJ, Mar. 1, 2022. In response, Ms. Worman provided no indication to the contrary; she only

stated that Ms. Lucio must pursue her request through the TDCJ grievance process. Compl.

Ex. 9, e-mail from Kristen Worman, general counsel for TDCJ, to A. Richard Ellis, counsel for

Ms. Lucio, Mar. 2, 2022. Yesterday, one day before briefing on Ms. Lucio's claims commenced

per this Court's order, TDCJ granted Ms. Lucio some opportunity for touch and audible prayer,

but (1) continued to deny her request that her spiritual advisor administer Viaticum in her last

moments, and (2) left it to the Warden's sole discretion to decide the moment(s) when her

spiritual advisor may audibly pray. Ex. 1, Step 2 Grievance Decision received by Ms. Lucio on

Apr. 7, 2022 ("Step 2 Grievance Decision") ("During the execution, your spiritual advisor will

be allowed to: 1. Anoint you on your forehead while you are on the gurney; 2. Stand at the head

of the gurney and place one hand on your shoulder; Pray aloud at a reasonable volume when

prompted by the Warden; and 4. Pray silently at all other times." Ex. 1, Step 2 Grievance

Decision received by Ms. Lucio on Apr. 7, 2022 ("Step 2 Grievance Decision").

## II.     TDCJ's Shifting Policies

Before 2019, TDCJ allowed TDCJ-approved chaplains in the execution chamber.

Compl. ¶ 15. In April 2019, TDCJ revised its Execution Procedure to ban the presence of

spiritual advisors in the execution chamber, including TDCJ-approved chaplains. Compl. Ex. 1,

Tex. Dep't Crim. Just., Execution Procedure at 8 (Apr. 2019). TDCJ changed its policy after the

Supreme Court's stay in *Murphy v. Collier*, 139 S. Ct. 1475 (2019), opting to ban all spiritual

advisors from the execution chamber rather than allowing advisors from a broader range of faiths

such as Buddhism to minister to death-sentenced individuals. In April 2021, TDCJ again revised

its execution procedure after a stay of execution. *Gutierrez v. Saenz*, 141 S. Ct. 1260 (2021).

This time, TDCJ's policies allowed inmates to be accompanied by a spiritual advisor, provided

the advisor is verified and passes a background check. Compl. Ex. 2, Tex. Dep't Crim. Just.,

Execution Procedure at 8 (Apr. 2021). But TDCJ's shift in position included new unwritten

limitations: "No Contact" and "No Speaking" policies, banning spiritual advisors from praying aloud or touching inmates in the execution chamber. *See* Compl. ¶¶ 21–26.

In September 2021, the Supreme Court stayed the execution of John Henry Ramirez and granted a writ of certiorari to consider Mr. Ramirez's challenge to TDCJ's "No Contact" and "No Speaking" policies. *Ramirez v. Collier*, 142 S. Ct. 50 (2021). Two months later, a court in this District stayed the execution of a death-sentenced individual in view of the pending spiritual advisor litigation in *Ramirez*. *Barbee v. Collier*, No. 4:21-CV-3077, 2021 WL 4666778 (S.D. Tex. Oct. 7, 2021).[1] On March 30, 2022, the Supreme Court ruled that Mr. Ramirez "is likely to prevail on the merits of his RLUIPA claims and that the other preliminary injunction factors justify relief." *Ramirez*, 2022 WL 867311, at *14. The Supreme Court remanded *Ramirez* for further proceedings, explaining that "[i]f Texas reschedules Ramirez's execution and declines to permit audible prayer or religious touch, the District Court should … enter appropriate preliminary relief." *Id.*

In an effort to provide clarity and allow for the speedy resolution of these RLUIPA claims, the Supreme Court held that the "timely resolution of such claims could be facilitated if States were to adopt policies anticipating and addressing issues likely to arise. Doing so would assist both prison officials responsible for carrying out executions and prisoners preparing to confront the end of life according to their religious beliefs." *Id.* at *13. The Supreme Court explained that "[s]tates could also adopt streamlined procedures … so that these potentially complicated matters can be litigated at all levels well in advance of any scheduled execution,"

---

[1] In addition to *Barbee*, "several other executions have been rescheduled or taken off the calendar while waiting for the [Supreme Court] to resolve the religious rights question" in *Ramirez*. Jolie McCullough, *U.S. Supreme Court tells Texas to let a condemned man's pastor touch him and pray aloud during execution*, Tex. Trib. (Mar. 24, 2022), https://www.texastribune.org/20022/03/24/supreme-court-john-ramirez/ (noting that since Ramirez's stay of execution, only one execution has gone forward).

and that "[i]f States adopt clear rules in advance, it should be the rare case that requires last-minute resort to the federal courts." *Id.* at \*13-\*14. Despite this clear guidance, TDCJ has refused to adopt clear policies, rules, and regulations or to modify its current protocol. *See* Compl. Ex. 2, Tex. Dep't Crim. Just., Execution Procedure (Apr. 2021). On March 30, 2022, following the Supreme Court's decision in *Ramirez*, unnamed "Texas prison officials" told the press that "they don't plan to formally update their rules after last week's Supreme Court ruling," and that "such requests by inmates will be reviewed on a case-by-case basis." Juan Lozano, *Texas to Review Prayer, Touch Requests in Executions by Case*, Associated Press (Mar. 30, 2022), *available at* https://www.nbcdfw.com/news/local/texas-news/texas-to-review-prayer-touch-requests-in-executions-by-case/2927750/. The State's case-by-case review has caused precisely the sort of confusion the Supreme Court predicted. Even in partially granting Ms. Lucio's request for audible prayer, for example, the State's review has wrought more confusion by delegating sole discretion to the Warden to determine when it is appropriate for Ms. Lucio's spiritual advisor to pray. The State's failure to heed the Supreme Court's advice has resulted in an equivocal decision on Ms. Lucio's request just one day before her motion for a stay of execution was to be filed.

## ARGUMENT

In considering Ms. Lucio's request for a stay, this Court considers four factors: (1) whether the applicant has made a strong showing that she is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the balance of equities is in the applicant's favor, i.e., whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Of the stay-of-execution factors," the first

two factors—"the likelihood of success on the merits and irreparable harm"—"are 'the most critical.'" *Barbee*, 2021 WL 4666778, at *5 (citing *Nken*, 556 U.S. at 434). Here, each factor strongly favors a stay.

## I.   Ms. Lucio Is Likely to Succeed on the Merits of Her Claims

### A.   RLUIPA

Ms. Lucio is likely to succeed on her RLUIPA claim. Congress enacted RLUIPA "to provide very broad protection for religious liberty"—"even greater protection than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 356-57 (2015). RLUIPA provides that the government shall not "impose a substantial burden" on an inmate's "religious exercise," unless the government shows that imposing such a burden can withstand strict scrutiny. *See* 42 U.S.C. § 2000cc-1(a). The prisoner's request for accommodation "must be sincerely based on a religious belief and not some other motivation," *Holt*, 574 U. S. at 360–61, and demonstrate that the policy "substantially burden[s] that exercise of religion." *Id*. at 361. "Once a plaintiff makes such a showing, the burden flips and the government must 'demonstrate[] that imposition of the burden on that person' is the least restrictive means of furthering a compelling governmental interest." *Ramirez*, 2022 WL 867311, at *10. The Supreme Court has characterized this standard as "exceptionally demanding." *Holt*, 574 U.S. at 364. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id*. at 365 (citation omitted).

Ms. Lucio has made the requisite showing that her religious requests are "sincerely based on a religious belief," *Holt*, 574 U.S. at 360–61, and that the TDCJ policies would operate as a substantial burden on those beliefs. *Id*. at 361. There can be no question about the sincerity of Ms. Lucio's beliefs. As her complaint (and *seventeen* supporting declarations, Compl. Exs. 10–13, 15–27) describes in great detail, Ms. Lucio's Roman Catholic faith is strong, abiding, and

sincere.  She attends Mass regularly; meets with her spiritual advisor, Deacon Lastovica, weekly; reads the Bible on her own; and engages with her fellow inmates in Bible study and discussions. Compl. ¶¶ 42, 44, 57–59, 61.  Her spiritual advisor attests that Ms. Lucio "ministers to him more than [he] minister[s] to her," Compl. Ex. 13, Decl. of Ronald Wayne Lastovica, Deacon ¶ 7, and her oldest son John explains that at every one of his weekly visits, they "set aside some time at the beginning to pray aloud" and discuss different sermons, Compl. Ex. 15 Decl. of John Vincent Lucio ¶ 6.  "In the visiting room" at Mountain View, John says, "there are Bibles on both sides of the wall, and [they] both get one to help [them]."  *Id*.  Her faith is obvious to all who know her: her family, Compl. Exs. 15, 17–19; her religious community, Compl. Ex. 12–13; her fellow inmates on death row, Compl. Exs. 11, 21–22; and those who have visited and corresponded with her over the years, Compl. Exs. 23–27.

There can also be no dispute that the sacrament of Viaticum, which by definition includes a specific combination of audible prayer and physical touch, see *supra*, is an integral part of Ms. Lucio's Catholic faith and the Catholic liturgy.  The spiritual-advisor (and not Warden) led performance of last rites and sacraments, including Viaticum, is an essential part of the preparation for death as a Roman Catholic.  *See* Int'l Comm'n on English in the Liturgy, *supra*, at 158; Delany, *supra*; Compl. Ex. 7, Step 2 Grievance.  Indeed, the federal government recently allowed Dustin Honken to receive precisely the same accommodations that Ms. Lucio requests here:  "Father O'Keefe went to Mr. Honken to administer his last rites.  Father O'Keefe gave him his final communion, placing a host on Mr. Honken's tongue, putting holy oil on his head and hands, and delivering several prayers out loud."  Br. of Spiritual Advisors Former Corr. Officials as *Amicus Curiae* in Supp. of Pet'r, *Ramirez v. Collier*, ___ S. Ct.___ (U.S. Mar. 24, 2022) (No. 21-5592), 2021 WL 4670366, at *14–15.

The burden is thus on the State to demonstrate that TDCJ's "No Speaking" and "No Contact" policies as they are applied here to prohibit Viaticum and allow the Warden to dictate the extent and timing of audible prayer are "the least restrictive means of furthering a compelling governmental interest." *Ramirez*, 2022 WL 867311, at *10. The State cannot do so. In *Ramirez*, the Supreme Court pointed to the "rich history of clerical prayer at the time of a prisoner's execution, dating well back before the founding of our Nation." *Id*. at *9. The Court also noted that "[i]n 2020 and 2021, the Federal Bureau of Prisons allowed religious advisors to speak or pray audibly with inmates during at least six federal executions, noting that Texas itself prohibited such prayer "only in the last several years." *Id.* Texas failed to explain why allowing audible speech during the executions was "not feasible," nor was there any basis to defer to that assertion, as "Texas has 'historically and routinely allowed prison chaplains to audibly pray' with the condemned during executions, a fact Texas [did] not dispute." *Id*. at *10 (citing Br. for Pet'r at 29). Nor did the Supreme Court accept Texas's conjecture that the spiritual advisors might disrupt or interfere with the executions, as "'[s]uch speculation is insufficient to satisfy' respondents' burden." *Id*. (citing *Fulton v. Philadelphia*, 141 S. Ct. 1868 (2021)). Texas failed to show that the blanket prohibition on audible prayer was "the least restrictive means of furthering their asserted interests." *Id.* at *11.

The categorical prohibition on touching fared no better. There too, the State could not show that a categorical ban was "the least restrictive means of furthering [its] interests," which included possible accidental interference with an IV line, giving the medical team an unobstructed view, or traumatizing the victim's family.[2] *Id.* at *11-*12.

---

[2] Here, several members of the victim's family—which is also Ms. Lucio's family—have submitted declarations on Ms. Lucio's behalf and expressed their hope that she will be able to observe her Roman Catholic faith in the final moments of her life. *See, e.g.*, Compl. Ex. 15,

All of these factors led the Supreme Court to conclude that Ramirez was "likely to prevail on his claim that Texas's categorical ban on religious touch in the execution chamber is inconsistent with his rights under RLUIPA." *Id*. The same conclusion follows here. Nor does it matter that the State has granted *some* of Ms. Lucio's requests for ministration prior to execution. Some physical touch and audible prayer at the election of the Warden is no substitute for the kind of audible prayer and physical touch necessary to perform last rites, including Viaticum.

**B.      Free Exercise Clause**

For much the same reasons, Ms. Lucio is likely to succeed on the merits of her First Amendment claim. The First Amendment's Free Exercise Clause requires that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise" of religion. U.S. Const. amend. I. The Free Exercise Clause is also binding on the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the protections of the Free Exercise Clause are incorporated by the Fourteenth Amendment against the states). When a state infringes on an inmate's ability to freely exercise their religion, courts must determine whether the law or policy is neutral or generally applicable. *Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). If the law or policy is neutral and generally applicable, it is permissible so long as it has only an "incidental effect of burdening a particular religious practice." *Id*. If it is not neutral and generally applicable, however, the State must show a "compelling governmental interest" that is "narrowly tailored to advance that interest." *Id*. at 531–32. A law or policy "that targets religious conduct for distinctive treatment or advances legitimate governmental interests

---

Decl. of John Vincent Lucio (Ms. Lucio's son and the victim's sister); Compl. Ex. 16, Decl. of Bobby Alvarez ¶ 3 (Ms. Lucio's son and the victim's sister); Compl. Ex. 17, Decl. of Melissa Lucio (Jr.) ¶ 3 (Ms. Lucio's daughter and the victim's sister); Compl. Ex. 18, Decl. of Diane Cerda ¶ 3 (Ms. Lucio's younger sister and the victim's aunt); Compl. Ex. 19, Decl. of Sonya Valencia ¶ 3 (Ms. Lucio's younger sister and the victim's aunt); Compl. Ex. 20, Decl. of Vanessa Escamilla ¶ 3 (Ms. Lucio's niece and the victim's cousin).

only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Id*. at 546.

TDCJ's "No Speaking" and "No Contact" policies solely concern religious practices, and are thus by definition not neutral; they "target[ ] religious conduct for distinctive treatment." *Church of Lukumi*, 508 U.S. at 534. And they cannot withstand strict scrutiny. Even assuming the State has a compelling interest in, for example, security and preventing disruptions in the execution chamber, these policies are not the least restrictive means of furthering any such interest. As discussed *supra*, the Supreme Court recently explained just that in *Ramirez*. *See Ramirez*, 2022 WL 867311, at *11 ("[R]espondents have not shown that a total ban on audible prayer is the least restrictive means of furthering their asserted interests."); *id.* ("Texas's categorical ban on religious touch is not the least restrictive means of furthering such interests."). Notably, "the Federal Government and some states have recently allowed inmates' religious advisors into the execution room," and they "have been allowed to engage in audible prayer and limited touching of the inmate without apparent problems." *Id.* at *18 (Kavanaugh, J., concurring). Though the Court in *Ramirez* reached its conclusion in the context of petitioner's RLUIPA claim, the analysis is the same in the First Amendment context. *See Barbee*, 2021 WL 4666778, at *5 (although the court "focuse[d] its analysis on" movant's RLUIPA claim, it "[found] that the same logic would allow for a stay of [movant's] First Amendment claim").

## II.    TDCJ's Partial Denial of Ms. Lucio's Request for Last Rites, Including Its Summary Denial of Her Request for Viaticum, Will Cause Irreparable Harm

In a capital case, "the possibility of irreparable injury weighs heavily in the movant's favor, especially when [their] claim has some merit." *Battaglia v. Stephens*, 824 F.3d 470, 475 (5th Cir. 2016) (quotation omitted); *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (per curiam). Because of "[t]he irreversible nature of the death penalty," courts "must be particularly

certain that the legal issues 'have been sufficiently litigated,' and the criminal defendant accorded all the protections guaranteed [them] by the Constitution of the United States." *O'Bryan*, 691 F.2d at 708. This factor also strongly favors a stay.

Both the Supreme Court and the *Barbee* court have held that individuals similarly situated to Ms. Lucio "[are] likely to suffer irreparable harm in the absence of injunctive relief because [they] will be unable to engage in protected religious exercise in the final moments of [their] [lives]." *Ramirez*, 2022 WL 867311, at *12; *Barbee*, 2021 WL 4666778, at *8. The same is true here: Ms. Lucio will only be able to receive audible prayer at the whims of the Warden, and she will not be able to receive Viaticum at all. This harm can only be rectified now—before Ms. Lucio is executed—because "[c]ompensation paid to [the inmate's] estate would not remedy this harm, which is spiritual rather than pecuniary." *Ramirez*, 2022 WL 867311, at *18–19.

## III.    The Balance of Equities and the Public Interest Strongly Favor a Stay

The threat of irreparable injury to Ms. Lucio—her unlawful execution in a manner that violates her religious rights before a court is able to adjudicate her claims on the merits—unquestionably outweighs any potential harm to the State that would result if the State were required to wait to execute Ms. Lucio until this question is resolved. While the State has an interest "in timely enforcement of the death sentence," *United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020), the "[p]ublic interest is never served by a state's depriving an individual of a constitutional right." *Kite v. Marshall*, 454 F. Supp. 1347, 1351 (S.D. Tex. 1978). And "[c]ourts have recognized that 'because RLUIPA enforces the First Amendment and must be construed broadly to protect religious exercise, a RLUIPA violation is in the public interest and tips the balance of harms in the plaintiff's favor.'" *Barbee*, 2021 WL 4666778, at *8 (citing *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286, 294 (11th Cir. 2021)). Moreover, "granting of a

stay would harm Defendants only in that they could not conduct [Ms. Lucio's] execution on their current schedule"; they cannot point to any other injury. *Barbee*, 2021 WL 4666778, at *8.

A stay here also serves judicial economy because the remand proceedings in *Ramirez* may have an impact on the TDCJ policy and the legal issues in this case. Courts frequently grant stays when the resolution of another action may "bear upon the case," because a stay is most "efficient for [the court's] own docket and the fairest course for the parties[.]" *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). District courts routinely stay proceedings where resolution of an appeal in another matter may provide guidance to the district court in deciding the issues before it. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). This both preserves judicial resources and reduces the risk of inconsistent rulings that an appellate court might have to later disentangle.

The resolution of *Ramirez*, either in the district court or on appeal, may illuminate the applicable law and the relevant landscape of facts that need to be developed before this Court, particularly with regard to the propriety of the State's case-by-case review. *See, e.g.*, *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) ("the prospect of narrowing the factual and legal issues" counsels in favor of granting a stay). And the failure to grant a stay pending the resolution of *Ramirez* could result in inconsistent rulings that might delay the resolution of this matter. As the court in *Barbee* pointed out, "the *Ramirez* proceedings may clarify what technical requirements an inmate must meet in filing such litigation, what burden he must satisfy in showing an imposition on his religious worship, whether TDCJ has sufficiently justified its limitation on its new policy, and what relief is available in similar situations." Compl. Ex. 4, Order Staying Execution, *Barbee v. Collier*, No. 4:21-cv-3077 (S.D. Tex. Oct. 7, 2021) at 6.[3]

---

[3] The *Barbee* court outlined these pending questions in its order staying Mr. Barbee's execution,

Because those proceedings are ongoing, a stay is most "efficient for [the court's] own docket and the fairest course for the parties." *Leyva*, 593 F.2d at 863.

## CONCLUSION

For these reasons, and given the high stakes involved, this Court should grant Ms. Lucio's motion to stay her execution until it can resolve the merits of her claims. Such a stay would permit this Court to determine whether enforcement of the TDCJ "No Contact" and "No Speaking" policies to (1) deny Ms. Lucio's request for Viaticum and (2) unpredictably limit when her spiritual advisor may audible pray violates her rights under RLUIPA and the First Amendment, and to do so with the benefit of guidance from the outcome in parallel (but further along) litigation in this District Court.

---

and they formed the main rationale for its decision. The court pointed to TDCJ's "2021 execution protocol [which] is silent about a spiritual advisor's role inside the execution chamber. The written policy does not say that a spiritual advisor will have any constraint placed on the spiritual assistance he or she may provide the inmate as the execution proceeds." *Id*. at 4. The court also emphasized the fact-intensive questions involved there and in *Ramirez*, *id*. at 6 n.3, noting *Moussazadeh v. Texas Department of Criminal Justice*, 703 F.3d 781, 795 (5th Cir. 2012), which highlighted "the importance of a district court developing the rich factual record necessary to resolve an RLUIPA claim." *Id*.

DATED: April 8, 2022.

Respectfully submitted,

A. RICHARD ELLIS
75 Magee Ave.
Mill Valley, CA
(415) 389-6771
a.r.ellis@att.net

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas

TIVON SCHARDL
CHIEF, CAPITAL HABEAS UNIT
Texas Bar. No. 24127495
TIMOTHY GUMKOWSKI
Assistant Federal Public Defender
919 Congress, Suite 950
Austin, Texas 78701
(737) 207-3008
(512) 499-1584 (fax)
tivon_schardl@fd.org

*Counsel for Plaintiff Melissa Elizabeth Lucio*

**CERTIFICATE OF CONFERENCE**

Via e-mail communication on April 7, 2022, attorney for Defendants Jennifer Wren, of

the Office of the Attorney General, State of Texas, indicated to undersigned counsel that the

Defendants would oppose this motion to stay Lucio's execution.

*s/s A. Richard Ellis*
A.  Richard Ellis
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
a.r.ellis@att.net

# EXHIBIT



# Texas Department of Criminal Justice
# STEP 2     OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
| --- |
| Grievance #: 2022057748 |
| UGI Recd Date: 3·4·22 |
| HQ Recd Date: MAR 10 2022 |
| Date Due: 04·13·22 |
| Grievance Code: 100 |
| Investigator ID #: 12620 |
| Extension Date: |

Offender Name: Melissa E. Lucio     TDCJ # 999537

Unit: Mountain View     Housing Assignment: Death Row Cell#1

Unit where incident occurred: Mountain View

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

Give reason for appeal (Be specific).   *I am dissatisfied with the response at Step 1 because...*

As a "ROMAN CATHOLIC", one of our most sacred sacraments is "ANOINTING of THE SICK, and VIATICUM", also called last rites. In viaticum, the dying person is united with Christ in his/her passage out of this world to the Father.

The only way this is possible during my execution is if, my Spiritual Advisor is allowed and present inside the execution chamber with me, where he is able to lay hands on me, and pray the Roman Rite, established through the papal document, "Sacram unctionem infirmorum" of 1972.

My Spiritual Advisor will pray these prayers in a slow, quiet voice, alternating with periods of silence.

These prayers are intended to help the dying person, if still conscious, to face the natural human anxiety about death, by imitating Christ in his patient suffering and dying.

Even if I'm not conscious, my children, family and friends, will draw consolation from these prayers, and come to a better understanding of the paschal character of Christian death.

This may be visibly expressed by, making the sign of the cross on the forehead of the dying person, who was first signed with the cross at Baptism.

This last anointing fortifies the end of our earthly life, like a solid rampart for the final struggles before entering the Father's house.

---

I-128 Front (Revised 9-1-2007)    YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM     (OVER)

Appendix G

~~An investigation has been conducted by the Central Grievance Office. At this time, the TDCJ does not allow the spiritual advisor to touch the inmate or pray out loud once inside the execution chamber. No further relief can be granted by this department.~~

Offender Signature: _Melissa E Lucio_ Date: _March 2, 2022_

G₁ If your spiritual advisor is approved to be present inside the execution chamber during your execution pursuant to the established pre-approval process, your spiritual advisor will be escorted into the execution chamber by a TDCJ representative, who will stand next to your spiritual advisor throughout the execution. During the execution, your spiritual advisor will be allowed to:

*1. Anoint you on your forehead while you are on the gurney;*
*2. Stand at the head of the gurney and place one hand on your shoulder;*
*3. Pray aloud at a reasonable volume when prompted by the Warden; and*
*4. Pray silently at all other times.*

Your spiritual advisor will not be able to pray aloud while the CID Director or the Warden are speaking or when you are giving your last statement.

Signature A: _Jessica Riley_ J. RILEY 4/7/2022

Returned because: *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible. *

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments. *

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate. *

CGO Staff Signature: _____

**OFFICE USE ONLY**

Initial Submission    CGO Initials:_____

Date UGI Rec'd:_____

Date CGO Rec'd:_____

(check one)_____Screened _____Improperly Submitted

Comments: _____

Date Returned to Offender:_____

2nd Submission    CGO Initials: _____

Date UGI Rec'd:_____

Date CGO Rec'd:_____

(check one)_____Screened _____Improperly Submitted

Comments:_____

Date Returned to Offender:_____

3rd Submission    CGO Initials:_____

Date UGI Rec'd:_____

Date CGO Rec'd:_____

(check one)_____Screened _____Improperly Submitted

Comments:_____

Date Returned to Offender:_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MELISSA ELIZABETH LUCIO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | No. 4:22-cv-00996 |
| **vs.** | § | |
| **BRYAN COLLIER,** Executive Director, | § | |
| Texas Department of Criminal Justice | § | |
| Huntsville, Texas | § | |
| | § | |
| **BOBBY LUMPKIN,** Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | **(Death Penalty Case)** |
| Division, Huntsville, Texas | § | |
| | § | |
| **DENNIS CROWLEY,** Warden, Texas | § | **Ms. Lucio is scheduled to be** |
| Department of Criminal Justice, | § | **executed on April 27, 2022** |
| Huntsville Unit, | § | |
| Huntsville, Texas, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## <u>ORDER</u>

Upon due consideration of Plaintiff's Motion to stay her execution, the motion is granted and

Lucio's execution is hereby stayed.

It is so ORDERED.

_____
Date

_____
The Honorable Alfred H. Bennett
United States District Judge

## CERTIFICATE OF SERVICE

I certify that on April 8, 2022, I electronically filed the above motion with the Clerk of the Court for the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court, which will send notification of such filing to the following:

Edward Larry Marshall
Office of the Attorney General
PO Box 12548
Austin, TX 78711
512-936-1400
caddocket@oag.texas.gov

I certify that on April 8, 2020, I also served the above motion to the following, via e-mail:

Leah Jean O'Leary
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711
512-463-2080
leah.oleary@oag.texas.gov

Jennifer Wren
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711
512-936-2991
jennifer.wren@oag.texas.gov

/s/*A. Richard Ellis*
A. RICHARD ELLIS
Attorney for Melissa Lucio